**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM SCHULTZ, an individual, <br><br> *Plaintiff,* <br><br> v. <br><br> WEATHERHUNTERS, INC., a New York Corporation, AL ROKER ENTERTAINMENT, INC., a New York Corporation, AL ROKER an individual and LISA TUCKER, an individual <br><br><br> *Defendants.* | Case No.: <br><br> **JURY TRIAL DEMANDED** <br><br> **COMPLAINT** |

William "Bill" Schultz ("Plaintiff" or "William Schultz") for his Complaint against defendants WeatherHunters, Inc. ("WHI"), Al Roker Entertainment, Inc., Al Roker, an individual, and Lisa Tucker, an individual (collectively, "Defendants"), alleges as follows:

<u>**INTRODUCTION**</u>

1.      The wrongful acts upon which this matter is based flows from the inappropriate conduct directed toward Plaintiff by Defendants Al Roker Entertainment, its alter ego WeatherHunters, Inc.("WHI") and individuals Al Roker and Lisa Tucker. Plaintiff, a noted and acclaimed producer of animated television programming, was wrongfully and illegally targeted, leading to the illegal termination of an agreement that he had with Defendant WHI and its Alter Ego Al Roker Entertainment in retaliation for Plaintiff standing tall as a whistle blower and complaining of: (i) illegal racial bias and discrimination against African Americans and other black, indigenous and other people of color ("BIPOC" people) in the workplace and; (ii) for objecting to the denigration and wholesale deconstruction of a diversity, equity, and inclusion ("DEI") program intended to bring minority writers onto a PBS television production. The subject DEI policy had been mandated by the Public Broadcasting System ("PBS") and was

implemented and administered by Plaintiff at the direction of Defendants. Following the implementation of the DEI Policy, Defendants attempted to disregard and minimize it and retaliated against Mr. Schultz when he objected to issues surrounding the conduct of Defendants concerning the DEI Policy and race. As a result of the extreme and inexcusable illegal conduct of Defendants as herein alleged, Plaintiff has sustained material harm, detriment and damage.

## THE PARTIES

2.      Plaintiff William Schultz is a resident of County of Los Angeles, State of California. Plaintiff traveled to New York to meet with and to perform services on behalf of Defendants.

3.       Defendant Al Roker Entertainment is, and at all relevant times mentioned herein was, a corporation organized and existing under the laws of the State of Delaware, with its ostensible and purported principal place of business and offices in New York. At all relevant times, Defendant Al Roker Entertainment was actively doing business in this Judicial District.

4.      Defendant WHI is, and at all relevant times mentioned herein was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business and offices in New York. At all relevant times, Defendant WHI was actively doing business in this Judicial District Defendants, and each of them as alleged herein, wrongfully and willfully breached a valid and subsisting written contract that they had induced Plaintiff to enter, together with committing other wrongs surrounding leading to and surrounding the breach of Contract.

5.      Plaintiff is informed and believed and thereupon alleges that defendant Al Roker, an individual is a resident of the State of New York.

6.      Plaintiff is informed and believes and thereupon alleges that defendant Lisa Tucker, an individual is a resident of the State of New York.

## JURISDICTION

7.      This action, as hereinafter more fully appears, is subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332(a) based upon the amount in controversy being in excess of

$75,000.00 and the diversity of the parties, which is brought about by the fact that Plaintiff is a resident of the County of Los Angeles, State of California; WHI and Al Roker Entertainment are corporations organized under the laws of, and doing business in, the State of New York; and Al Roker and Lisa Tucker as individual defendants are residents of the State of New York.

8.      Venue of this action is properly in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the wrongful course of conduct and injury to Plaintiff occurred in the Southern District of New York. Namely, Plaintiff: (i) established his relationship with Defendants in New York; (ii) met with Defendants in New York, (iii) performed work under his contract with Defendants in New York, and (iv) the Agreement for between the parties calls for jurisdiction and venue in New York, under the application of New York law.

## ALTER EGO ALLEGATIONS

9.      Defendant WHI, Inc is Defendant Al Roker Entertainment and Defendant Al Roker Entertainment is WHI. Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times mentioned herein, Defendants WHI, Inc and Defendant Al Roker Entertainment were, and are, the agents, servants, alter egos and/or employees of each of the other Defendants, and all the things alleged to have been done by Defendants were done in the capacity of and as agent, servant, alter ego and/or employee of and for the other Defendants, with their knowledge approval, and ratification. Al Roker is the one hundred percent (100%) owner and control person of Al Roker Entertainment and is the 100% owner of WHI.

10.      On information and belief, Defendants Al Roker Entertainment and WHI, Inc (jointly, the "Alter Egos") are all alter egos, with one being an alter ego of the other. Plaintiff is informed and believes, and on that basis alleges, that, at all times material hereto, the unity of interest and ownership existed between Al Roker Entertainment, on the one hand, and WHI, the Alter Ego, on the other hand, such that the individuality and separateness of Al Roker Entertainment and WHI. ceased, and Al Roker Entertainment, and at all times mentioned hereunder was, the alter ego of Defendant WHI.

11.      Therefore, adherence to the fiction of the separate existence of Al Roker

Entertainment as an entity distinct from WHI as its Alter Egos would permit an abuse of the corporate privilege and would sanction fraud or promote injustice, in that Alter Ego Al Roker Entertainment might escape liability for the causes of action set out herein. In particular, adherence to the fiction of the separate existence of WHI as an entity distinct from its Alter Al Roker Entertainment would permit an abuse of the corporate privilege and produce an inequitable result.

12.      Plaintiff is informed and believes, and on that basis alleges, that during the course of the relevant period, Defendant Al Roker Entertainment was WHI's sole and exclusive decision-making authority such that Al Roker Entertainment exercised ultimate, unfettered domination and control over WHI's finances and operations. Specifically, Defendant Al Roker Entertainment's sole, sovereign dominion and control over WHI's finances and operations resulted in a symbiotic relationship between both entities such that WHI operated as a shill and a façade for the benefit of Al Roker Entertainment.

13.      For example, Defendant Al Roker Entertainment "executives" dominated and controlled the operations of WHI. In fact, the wrongful and pretextual "Cure notice" that was received by Plaintiff as the antecedent to his firing was sent by and on behalf of Al Roker Entertainment, on stationery of Al Roker Entertainment and signed by a senior "executive" of Al Roker Entertainment.

14.      There was no separation between the operations of WHI and Al Roker Entertainment. Al Roker Entertainment exercised full dominion and control over WHI with the executives of Al Roker Entertainment operating and running each and every aspect of WHI. WHI was operated out of the same premises as Al Roker Entertainment. Al Roker Entertainment and WHI were one and the same.

## FACTUAL BACKGROUND

### Al Roker and Al Roker Entertainment Retain Plaintiff to Produce the Program

15.      Plaintiff William Schultz is a highly accomplished and acclaimed producer and

executive in the very specialized world of production of animated television programing. Among Plaintiff's achievement are credits on highly successful programs such as "The Simpsons," "King of the Hill," "Clifford the Big Red Dog," "Ed, Edd & Eddy," and many other long running and award-winning animated TV series. Additionally, Plaintiff has been an executive in charge of production/Supervising Producer at The Cartoon Network, where he was responsible for the supervision of four simultaneous television productions and the development and start-up of the network's own Animation studio, in Burbank, California. Mr. Schultz also was an executive at Marvel Animation Studios and at the acclaimed independent award-winning animation studio known as "Film Roman" where he oversaw production of as many as ten series in production at the same time —including such renowned programs as the Simpsons, King of the Hill, and Garfield. The production of first-class animated programming is a rarified enterprise and there are few executives of Mr. Schultz's caliber who possess the creative, business and financial abilities and skill sets to develop, sell, and produce high quality successful animated programming.

16.     In or about 2014, Mr. Schultz began working with Al Roker most well-known as the weatherman on NBC's "Today Show." While Mr. Roker was an established media personality, he was neither an experienced businessperson nor a producer, but wished to venture into the production of an animated television series utilizing his eponymous "Al Roker Entertainment" entity to produce a multimillion-dollar animated children's program known as "Weather Hunters" (the "Program"). Mr. Roker had no prior experience with producing an animated program, or any program of the scope and nature of the instant Program. (Prior to becoming involved in this endeavor, Al Roker Entertainment produced some industrial content, and a few semi-mainstream reality type shows, but no scripted series or animated series and none where he was in charge of the script writing or complex deficit financing of proprietary programming.)

17.     Because Al Roker had limited experience in this type of enterprise and producing activities  as a proprietary network series animation producer he looked to the skill and expertise

of Mr. Schultz to guide and lead the entire process—from Mr. Roker's three- to four-page draft concept ultimately to the 40 half-hour Season one episodes eventually ordered by PBS. Mr. Schultz remained committed to, seeing through the development, production of a pilot and greenlighting the full production of the Program for nine years, while receiving virtually no upfront compensation. Mr. Schultz's remained dedicated to achieving this production commitment—mostly because of his passion for what the Program could be.

18.     Mr. Schultz conceived, conceptualized, and created the entire business plan for the Program. Mr. Schultz was indispensable in the creation of the Program and worked tirelessly to create a financial plan where one hundred percent (100%) of the ownership of the Program would be retained under the control and ownership of Al Roker, and whereby Al Roker is able to cover almost 100% of the cost of production with outside financing and not having to put hardly any money at all into the Program. Mr. Schultz created a model which will greatly enrich Al Roker.

19.     In 2018, with the continued significant efforts of Mr. Schultz, after almost five years of program bible and pilot script development, a deal was finally negotiated with PBS whereunder PBS contributed $350,000 to a pilot that was budgeted at roughly $800,000. The pilot that was produced, by all accounts, achieved an unprecedented enthusiasm in the community and was considered to be a resounding success. Mr. Schultz leveraged all his substantial experience and industry goodwill to assemble all the key elements to the project: the best of the best: writers, directors, designers, animators, and music postproduction experts. The pilot received a material deficit investment from everyone that worked on it and was produced as a first-class broadcast quality 11-minute pilot—far exceeding the "development" production quality standards contractually required by PBS without requiring additional investment from Mr. Roker. The pilot research test audience brought on board to review the program by PBS scored the pilot extremely enthusiastically— with the reaction in the research group and among PBS staff as total enthusiasm for how the show could be presented and perform on PBS Kids.

20.     The Program was sold to the Public Broadcasting System ("PBS") which

committed to contribute a significant portion of the multi-million-dollar production budget for the development and production of the First Season with an order for an initial forty (40) half hour episodes of the Program. Mr. Schultz was instrumental in the creation of the creative and business elements of the Program, including the financial model, the episodic pattern budgets, and establishment of all of the highly specific and unique animated series work that was necessary in the development and production of such a high-quality Program.

21.    From approximately 2014 until approximately mid-2022 Mr. Schultz worked on the Program with Tracie Brennan, the head of Al Roker Entertainment's production company, with Ms. Brennan representing and exercising all approvals on behalf of the production company. The relationship between Mr. Schultz and Ms. Brennan was professional, respectful, and highly productive. Al Roker in his capacity as the CEO of Al Roker Productions exercised his right and authority to make final decisions on material issues. Mr. Roker himself only did enough to cause PBS to believe that he was involved in the Production in return for their massive financial and programming schedule commitment. – During the five years of development and production, prior to the full series greenlight, Ms. Brennan and Mr. Schultz had a mutually respected interpersonal relationship. Ms. Brennan consistently achieved consensus with Mr. Schultz and trusted his judgement with respect to most of the production decisions – with the two transparently discussing and mutually consenting on almost all material matters.

22.    Quite unfortunately, Ms. Brennan became ill during 2020 and was ultimately unable to continue in her role in the production. In response to this unfortunate situation, Mr. Roker decided to try and replace Ms. Brennan, who had now gained significant cumulative firsthand, personal and foundational experience, knowledge and understanding of the entire production plan. Mr. Schultz worked almost exclusively with Ms. Brennan representing the production company. Mr. Roker ultimately replaced Ms. Brennan almost right at the beginning of the series production with Lisa Tucker, as Al Roker Entertainment's Senior Vice President and Caren Franklin, Director of Finance and Business Affairs. Neither of these individuals possessed the experience needed to take over the significant leadership roles on the production,

representing Al Roker Entertainment in place of Ms. Brennan.

23.     Mr. Roker deferred authority over finance and business on the production to Caren Franklin, his long serving, but part-time bookkeeper, with no real knowledge of the project, as all the development and pre-production was handled exclusively by Ms. Brennan. Ms. Franklin processed invoices once approved. In addition, Ms. Franklin had never headed any real production–and certainly not any that were anything like the specific and unique aspects of an animated series or scripted series television production of this scope. She always been subordinate to Ms. Brennan, certainly on this project and most likely all of the projects in which Al Roker Entertainment was involved.

24.     As Ms. Brennan became unable to maintain her role, Mr. Roker deferred her involvement to Lisa Tucker, a reality-show Producer the company had brought on to help with development of other projects. Ms. Tucker was a live action reality show producer without any animation credits or even any real scripted series producing experience. In assigning Ms. Tucker to fill in for Ms. Brennan, Ms. Tucker found herself  charged with overseeing the production of the brand new animated series Program, and in effect the management and expenditure of the millions and millions of dollars provided by PBS and other third party financiers, according to a budget and production finance plan that she had no knowledge of  and in fact, frequently complained she did not understand. With Mr. Roker's introduction of the inexperienced team of Mses. Franklin and Tucker in charge of the production for Al Roker Entertainment matters could not possibly go well, and of course they didn't go well at all.

25.     The harsh, abrasive, and condescending management style of both Franklin and Tucker did not translate well to the oversight of a creative enterprise staffed by over one hundred highly skilled and experienced animation artists. Further, the lack of any experience in animation on the part of Franklin and Tucker was highly problematic because although Franklin and Tucker were the executives in charge of Al Roker Productions and therefore were in charge of many decisions affecting the day to day production of the Show, they lacked basic understanding of the collaborative ecosystem necessary to achieve a high quality animated production, when faced

with any of the challenges to be expected on the 130 week production schedule designed to safeguard PBS's investment in and the network's expectations for the Program.

26.     The lack of experience of Franklin and Tucker was generally problematic for the viability of the Program, but was especially problematic for Mr. Schultz, as a professionally-acclaimed, experienced and commercially-successful producer of animated television—and also with many others on the team. Franklin and Tucker's lack of fundamental understanding of the production of an animated television series such as the Program by caused a degree of conflict not typical in the experience of Mr. Schultz on the project with the company. They were each quite defensive and insecure in dealing with the project, apparently threatened by Mr. Schultz's evident experience and expertise in animated tv series production and finance. This hostility manifested itself in petty personal attacks, micro-aggressions and the general denigration and diminishment of Mr. Schultz at the hands of Franklin and Tucker. All the while Al Roker, who could exercise full control over and resolve the situation did nothing to intercede. Ultimately, the matter came to a head leading to the pretextual termination of Mr. Schultz.

**The Services Agreement between WHI and the Plaintiff**

27.     On January 9, 2023, WHI and Home Plate Entertainment Company entered into a Services Agreement (the "Agreement'). A true and correct copy of the Agreement is attached as Exhibit "A".

28.     Weather Hunters, Inc was an empty shell of an entity that was a complete alter ego of Al Roker Entertainment. Home Plate Entertainment was a loan-out entity providing the services of Mr. Schultz. Mr. Schultz personally signed an inducement and guarantee to the Agreement. Pursuant to the terms of the Agreement William Schultz was to provide services as an Executive Producer, on a non-exclusive basis. Under the agreement Schultz was to consult with and help "Company" (WHI) manage all creative and business elements of the Series (i.e. "Weather Hunters").

29.     In return, Mr. Schultz, in addition to other compensation, would receive: (1) a flat fee of $544,500, paid in installments and increasing by 3% for each series order after the initial

40 episode order; (2) a "Participation Fee" equal to 25% of WHI's net revenue as defined in the Agreement; and (3) an "Executive Producer" and "Creative Development" credit.

30.     Based on the foregoing, Mr. Schultz has standing to enforce the Services Agreement as an intended third-party beneficiary because the Service Agreement was binding on the parties and Mr. Schultz's benefit from the agreement was direct rather than incidental.

**PBS's Mandatory DEI Initiative**

31.     Surprisingly, here, where the control person is Al Roker, a leading African American media personality and the Program concept is focused on an African American Family and was inclusively developed for PBS's importantly diverse children's audience, the issue that doomed Mr. Schultz and led to his wrongful termination and the wholesale breach of contract was the issue of racial diversity—specifically Defendants' unjustified antipathy towards instituting PBS's mandatory diversity, equity, and inclusion ("DEI") policies . One would believe that that there would be appropriate sensitivity concerning issues relating to race and African Americans. Unfortunately, that was not the case.

32.     The interpersonal dynamic was this: Mr. Schultz believes in diversity and racial inclusion. Franklin and Tucker both Caucasian and despite wishing to appear supportive of the diversity policy, demonstrated surprisingly low tolerance or appreciation for or interest in supporting matters of diversity and racial inclusion with regard to the production. Al Roker the boss, proved himself unwilling to support the proper decisions in adherence to this issue as it was brought before him. The DEI policy which Defendants callously disregarded was justifiably rooted in the very real and wide-spread social upheaval throughout the country and indeed, the world, in the aftermath of prominent murders of African Americans at the hands of police. This social awakening, particularly following the murder of George Floyd was a transformative event for the country generally, and for PBS in particular. Like many leading broadcasters in our Country, PBS recognized and made strong efforts to address that the issue of lack of diversity on both sides of the camera was an issue that needed to be reckoned with throughout the planned

production of all of its Children's Programming. That was especially true for a show primarily targeted at African American and BIPOC families and their children such as the Program was.

33.     Mr. Schultz consistently maintained a vision for staffing and producing the Program with a diverse group of creators and artists and was fully cooperative when PBS took this one step further and made it an absolute contractual mandate as a condition of greenlighting the full production. PBS created a DEI policy and made it a contractual requirement for all of its new children's programs. However, rather than treating the DEI policy as the mandatory and important policy it was meant to be, Franklin and Tucker, who had been given total authority over the Project by Al Roker Entertainment, treated the DEI Policy as discretionary and an obstacle to be circumvented to produce the show. This difference of opinion was at the core of much of the antagonistic treatment heaped upon Mr. Schultz by these two executives.

34.     To Mr. Schultz the PBS mandated DEI policy created a genuine and important opportunity to recruit, develop and work with a diverse group of newly empowered artists, creators and production staff and to embrace the challenge that the PBS mandated DEI policy represented. Mr. Schultz believed that the Program had to embrace the DEI initiative required by the network and its financiers, and also to appreciate the opportunity. The DEI policy that was developed by PBS and a plan was implemented by Mr. Schultz and the team he was assembling – and it allowed an opportunity for a historically marginalized group of animation professionals to have a greater opportunity to take important seats at the table to tell its story and speak to the audience on the PBS Kids network.

35.     Franklin and Tucker failed to embrace what Mr. Schultz viewed as a wonderful opportunity to provide an under-represented historically marginalized Class of people the opportunities, that heretofore were only reserved for the historically dominant white Hollywood animation industry. In not supporting the initiative fully, and instead looking to appear to satisfy the plan, the executives only reinforced a perpetual form of racism that was insidious.

36.     Mr. Schultz believed that for the Program to truly embrace PBS's mandated DEI policy, the production team was morally obligated to go to the extra lengths and efforts to find

and amplify diverse "new voices." Indeed, these new voices were exactly what DEI is all about. Creating opportunities for these new voices was clearly the mantra of the Program under Mr. Schultz. Obviously, finding "new" voices sometimes meant less experienced—though not less qualified or talented—voices. In any event, PBS (including its sister affiliated company, the Corporation for Public Broadcasting ["CPB"]) was supplying approximately 70% of the financing for the project -with the stipulation that the Show would adhere to the approved DEI plan, which was designed to support recruiting, developing, mentoring and working with "new voices", in accordance with the approved DEI Plan (as developed by the Show, presented to PBS and approved by PBS Kids). The plan was also circulated widely among the members of the production team and attached to contracts of all parties.

37.    Unfortunately, Franklin and Tucker did not support or have any real tolerance for the PBS mandated DEI Policy; they did not respect what Mr. Schultz had put in place or what he advocated for daily. Disingenuously, Franklin and Tucker parroted the language of DEI to those on the outside of the production but in reality, and behind the scenes, the real story was the opposite. They saw the use of "BIPOC" individuals as a handicap or unwelcome obstacle that could be disregarded if necessary and be evaded or overcome—even if it meant using underhanded and deceptive tactics. Further, management at Al Roker Entertainment did not see the PBS DEI mandate as a requirement: It was a box to be checked in the most expedient manner possible. Management of Al Roker Entertainment never appreciated or embraced the opportunity the plan afforded those it was intended to benefit.

38.    Franklin and Tucker often saw the DEI policy as an impediment to business as usual, and they endeavored to minimize efforts to embrace it and supported and participated with those who looked for ways to evade it. They went so far as to attempt to coerce Jerry Brice, the African-American supervising producer, who wrote the PBS- approved DEI plan and had been specifically charged with deepening the production's relationships in the African-American community, to cosign their "workarounds" so that the production could just hire white writers, and not have to work with "BIPOC" writers, who they falsely claimed were not acceptable. But

Mr. Brice resisted and refused to bend to management's offensive demands, so he too faced their wrath and was reprimanded. Management of Al Roker Entertainment as actively and consistently embodied in Tucker and Franklin, and ratified by Mr. Roker, worked to undermine the DEI Policy, clearly missed the point of DEI and also did not appreciate how the Show benefitted authentically and creatively from the prominence of the PBS mandate. Mr. Schultz (along with other allies he had recruited were the ones at the table that truly embraced the opportunity and requirement of PBS's reinvigorated DEI policy. The active antagonism of Tucker and Franklin toward Mr. Schultz and their attempts to undermine Mr. Schultz's authority and management solutions, including strong adherence to the policy created conflict with Mr. Schultz, a conflict that proximately led to the pretextual and wrongful firing of Mr. Schultz and the breach of his Agreement. Mr. Schultz met with Al Roker to inform him of the denigration of the DEI policy by the management of Al Roker Entertainment and sought his intervention and his support. However, Al Roker refused to provide any support to Mr. Schultz or to preserve the compliance and sanctity of the PBS-mandated DEI policy.

39.     Defendants' wholesale abrogation of the DEI policy eventually came to an ugly head sealing the fate of Mr. Schultz. During a story meeting on or about August 15th, 2023, conducted remotely via Zoom, the Program's story editor, enabled and supported by Al Roker Entertainment management, with no truthful justification claimed that the Production simply could not meet the production schedule if "BIPOC" writers were used to write the stories. He said that the BIPOC writers "sucked" and were inexperienced. And because of that, in order to meet the schedule, he would need to hire "experienced non-BIPOC writers". Sadly, this ridiculous and often repeated fallacy is the foundation of the often-racist staffing policies that have plagued the entertainment industry for years and ironically is the basis for the requirement of the existence of the DEI policy itself. Instead of giving the chances to BIPOC writers as had been the plan, the story editor, repeating a strategy previously advocated and backed by Al Roker Entertainment management in writing, wanted to have "non-BIPOC" writers write the stories, and then bring on a "BIPOC" writer and  after the stories/episodes [were] shaped, they could be

"hand[ed] off to BIPOC writers". This was a deceptive and cynical tactic to give the false appearance of diversity in writing and show "numbers" supporting diversity while side-stepping the effort to recruit, develop and work with BIPOC writers he wrongly and offensively characterized as less capable. He and Defendants completely missed the point and, to add insult to injury, the writing he commissioned not only was no better than that of BIPOC writers (some of the best scripts were from the "new voices") but further, showed a lack of sensitivity to the cultural authenticity which was one of the motives for DEI and a major selling point of the Program.

40.     Mr. Schultz was against this deceptive and offensive tactic because not only did it deprive the show of highly valued authenticity, but it also violated exactly what the DEI policy was all about. PBS and Mr. Schultz and many others on the production appreciated that the critically important authenticity of the Program's stories should come from the authentic lived experience of BIPOC writers. The notion of "nothing about us without us" – a phrase used to underscore much of the meaning and motivation for enacting diversity policies was being blatantly, violated, and with the full support of Al Roker Entertainment, and Mr. Roker's silent ratification. This situation led to a verbally heated confrontation during the story meeting.

41.     The meeting initially proceeded calmly but the production staff exchanged some harsh words and a third-party called out Tucker (who was not actually in the meeting) and the show's non-writing executive producer ("NWEP") as "two white women controlling a black show" *after* the story editor said that "BIPOC writers suck" and therefore they could not write the premises or outlines. Mr. Schultz was upset and offended by this racist ideology as were many others on the production staff. The words themselves greatly offended Mr. Schultz, but the fact that the story editor felt comfortable voicing such an offensive screed within the environment of acceptance Mr. Schultz strove so hard to create within the production team hurt Mr. Schultz, who had led implementation of PBS's mandatory DEI policy, to his core and he could not in good conscience affirm such egregious conduct by his silence.

**Defendants Wrongfully Terminate Mr. Schultz**

42.     In or about early September 2023, Defendants further enflamed the DEI situation when Tucker and Franklin reprimanded an African-American producer on the Program critical of Defendants evisceration of the DEI policy—blaming him entirely for rising tension on the production, and backing the incredibly racist and false statement by the Program's story editor that "BIPOC writers suck." Mr. Schultz steadfastly stood by the need for Al Roker Entertainment and WHI to honor PBS's DEI policy and commitments and WHI's contractual agreement to do the same. Mr. Schultz also vocally and consistently objected to the scapegoating of the African American supervising producer on the Program. Unfortunately, Mr. Schultz's unequivocal and unwavering stance spelled the end for Mr. Schultz. Because Mr. Schultz complained about racism and racial slurs and voiced his disagreement with the dismantling of the DEI policy Mr. Schultz was targeted by Al Roker Entertainment, Franklin and Tucker.

43.     Mr. Schultz sympathized with and defended the DEI policy and made that fact known to Al Roker, Tucker and Franklin, and anyone on the production team who would listen. But Al Roker did nothing to bring Tucker and Franklin in line and from then on it became clear that Tucker and Franklin were looking for any way to push Mr. Schultz out of the project he had shepherded and championed for nearly a decade. In time Mr. Schultz was served with a pretextual, bad faith notice to cure fabricated contractual breaches which were clearly styled so as not to be curable. Based on these fabrications, Al Roker Entertainment subsequently suspended Mr. Schultz and then terminated him. This lawsuit followed.

44.     On February 22, 2024, Al Roker Entertainment (on the Stationery of Al Roker Entertainment) delivered a letter (the "2/22/24 Letter") to Mr. Schultz erroneously styled as a "cure notice" pursuant to Section 8 of the Service Agreement. The Letter signed by Lisa Tucker in her capacity of SVP Development and Production at Al Roker Entertainment, references the Agreement and purports to seek a cure for the alleged and purported breaches on the part of Mr. Schultz. The eight enumerated breaches by Mr. Schultz were spurious, fabricated, made in bad faith and stood only as a pretext for the termination of Mr. Schultz and the breach of the Agreement. A true and correct copy of the pretextual Cure Notice is set forth as Exhibit "B".

45.     On March 7, 2024, counsel for Mr. Schultz responded to the bad faith Cure Notice by tendering a detailed refutation of each and every of the fabricated alleged breaches by him. A true and correct copy of the March 7, 2024, refutation by Plaintiff's counsel to Lisa Tucker, Senior Vice President of Al Roker Entertainment is attached hereto as Exhibit "C".

46.     On March 9, 2024, counsel for Mr. Schultz wrote again to Lisa Tucker, Senior Vice President at Al Roker Entertainment advising that the conduct of Al Roker Entertainment and WHI was causing great damage to Mr. Schultz and seeking a prompt conclusion of this matter. A true and correct copy of the March 9, 2024, letter is attached as Exhibit "D".

47.     On March 10, 2024, counsel for Plaintiff received notice from Counsel for Defendants that Mr. Schultz was being terminated (and his contract was being breached) based upon the manufactured pretextual grounds set forth in the Cure Notice. A true and correct copy of the letter of March 10, 2024, is set forth as Exhibit "E".

48.     On March 28, 2024, Counsel for Plaintiff received a Notice of Termination of the Agreement. A true and correct copy of the Notice of Termination is set forth as Exhibit "F". With this notice of Termination defendants concluded their illegal scheme to wrongfully terminate Plaintiff and to illegally breach the Agreement. The Termination was based on the baseless and manufactured grounds that were set forth in the Notice For Cure.

## FIRST CAUSE OF ACTION

### Violation of New York City Human Rights Law ( N.Y.C. Admin. Code § 8–101 et seq.)

(Against All Defendants)

49.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

50.     Pursuant to N.Y.C. Admin. Code § 8–107(1)(a), "[i]t shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived…race… color, national origin, gender…immigration or citizenship status of

any person: (1) To represent that any employment or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

51.     Pursuant to N.Y.C. Admin. Code § 8–107(6) "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

52.     Pursuant to N.Y.C. Admin. Code § 8–107(7) "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter[.]"

53.     As alleged above, Defendants unlawfully sought to evade PBS's mandatory DEI policy to exclude BIPOC persons from participating in the production of the Program and attempted to force Plaintiff to assist in such unlawful discriminatory practices. And, as a result of Plaintiff's refusal to participate in such practices and vocal objection to such unlawful discriminatory practices, Plaintiff's services for Defendants were unlawfully terminated.

54.     Pursuant to N.Y.C. Admin. Code § 8–402(a) and 8-120, Plaintiff seeks injunctive relief, damages, including punitive damages, and such other types of relief as are specified in subdivision a of section 8-120 including but not limited to hiring, reinstatement or upgrading of employment; the award of back pay and front pay; payment of compensatory damages; and payment of the Plaintiff's reasonable attorney's fees, expert fees and other costs.

55.     Defendants acted with oppression, intent, wantonness and malice and as such Plaintiff is entitled to an award of punitive or exemplary damages to punish Defendants and each of them for their wrongful conduct. As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less $10 million together with reimbursable costs according to proof plus interest, fees and costs at the maximum legal rate thereon.

## SECOND CAUSE OF ACTION

<u>Violation of New York State Human Rights Law (N.Y. Exec. Law § 296, et seq.)</u>

(Against All Defendants)

56.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

57.     Pursuant to N.Y. Exec. Law § 296(e) it is unlawful "[f]or any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

58.     Pursuant to N.Y. Exec. Law § 296-d "[a]n employer may be held liable to a non-employee who is a contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace or who is an employee of such contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace, with respect to an unlawful discriminatory practice, when the employer, its agents or supervisors knew or should have known that such non-employee was subjected to an unlawful discriminatory practice in the employer's workplace, and the employer failed to take immediate and appropriate corrective action."

59.     As alleged extensively above, Plaintiff disclosed to his Defendant supervisors Defendants' unlawful and discriminatory attempts to evade PBS's mandatory DEI policy and refused to assist Defendants in implementing these unlawful actions. And, as a result, Plaintiff was unlawfully terminated by Defendants.

60.     Pursuant to N.Y. Exec. Law § 297, Plaintiff seeks damages, including, punitive damages, and such other remedies as may be appropriate, including hiring, reinstatement or upgrading of employment; the award of back pay and front pay; payment of compensatory damages; and payment of the Plaintiff's reasonable attorney's fees, expert fees and other costs and any available civil fines and penalties.

61.     Defendants acted with oppression, intent, wantonness and malice and as such

Plaintiff is entitled to an award of punitive or exemplary damages to punish Defendants and each of them for their wrongful conduct. As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less than $10 million together with reimbursable costs according to proof plus interest, and costs at the maximum legal rate thereon.

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Contract**
(Against Defendant WHI and its Alter Ego Al Roker Entertainment)

62.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

63.     On January 9, 2023, Plaintiff and WHI entered into a binding agreement (the "Agreement") as described herein above.

64.     On February 22, 2024, Defendants Al Roker Entertainment and WHI sent Plaintiff a writing purported to be a cure notice regarding alleged failures of performance on the part of Plaintiff. The cure notice written on the stationery of Al Roker Entertainment and signed by an executive of Al Roker Entertainment was a pretextual sham.

65.     On March 28, 2024, Defendant WHI and its Alter Ego Al Roker Entertainment breached the Agreement by tendering a notice of termination.

66.     Plaintiff performed all of his obligations under the agreement, and any obligations not performed by Plaintiff were excused due to Defendants' nonperformance. Plaintiff timely did all acts necessary to fulfill the contract entered into with WHI.

67.     The alter-ego allegations stated above are expressly incorporated herein. As alter egos, Defendant Al Roker Entertainment is fully liable for the debts, obligations and liabilities of WHI. Notably, WHI was used as a fraudulent shill to exploit the services from unwary contractors such as Plaintiff.

68.     As a direct and proximate result of the Defendants' breach of the contract,

Plaintiff has been directly damaged in an amount to be proven at trial, but not less than $10 million together with reimbursable costs according to proof plus interest, and costs at the maximum legal rate thereon.

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

(Against Al Roker Entertainment and its Alter Ego WHI)

69.      Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

70.       On January 9, 2023, Plaintiff entered into an agreement with WHI and its Alter Ego Al Roker Productions. Implied in the agreement entered into between Plaintiff and Defendants is a covenant of good faith and fair dealing under which Defendant WHI and its Alter Ego Al Roker Entertainment would not take action or fail to take action that would undermine the benefits of the Agreement to Plaintiff.

71.      Defendant WHI and its Alter Ego Al Roker Entertainment undermined such benefits owed to Plaintiff by the acts and omissions alleged above, by wrongfully and illegally terminating the Agreement without cause, excuse or justification.

72.       As a result, dishonest conduct of WHI and Al Roker Entertainment and the manner in which it intentionally took of unfair advantage of Plaintiff's trust, which included the illegal manufacturing of pretextual claims to attempt to justify the termination of the Agreement,

73.      Defendants breached the implied covenant of good faith and fair dealing, and Plaintiff has been damaged in an amount according to proof but in an amount not less than $10 million.

## FIFTH CAUSE OF ACTION

### Breach of Implied-in-Fact Contract

(Against Defendants WHI and its Alter Ego Al Roker Entertainment)

74.      Plaintiff re-alleges and incorporates by reference the allegations contained in each

and every preceding paragraph above as though fully set forth herein.

75.     This Cause of Action is pled as an alternative to the First Cause of Action for breach of contract. Based upon the acts and conduct of the parties, and the surrounding circumstances, Defendant WHI entered into an implied-in-fact agreement with Plaintiff related to services to be provided by Plaintiff hereunder.

76.     The existence of the implied contract was manifested by the parties' clear respective conduct and WHI's express representations made by and through its agents. The obligation of WHI and its Alter Ego Al Roker Entertainment hereunder arises from the mutual agreement between Plaintiff and WHI and the clear promises and expressions of intent to promise expressed by WHI.

77.     Pursuant to the material terms of the implied-in-fact contract, Plaintiff was to provide services to Defendant WHI.

78.     Plaintiff did all, or substantially all, of what she was required to do under the terms of the parties' agreement, except to the extent that such terms and conditions to be performed by Plaintiff were excused or waived.

79.     WHI and its Alter Ego Al Roker Entertainment breached the parties' implied agreement by, among other things, attempting to abruptly and erroneously terminate the implied agreement between the Plaintiff and WHI.

80.     As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less than $10 million.

## SIXTH CAUSE OF ACTION
### Promissory Estoppel
*(Against WHI and its Alter Ego Al Roker Entertainment)*

81.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

82.     As more fully alleged hereinabove, Defendant WHI entered into a written contract

with Plaintiff which it terminated and thereby breached. Prior to the breach of contract, the Defendants repeatedly and affirmatively promised and caused Plaintiff to believe, understand, and rely on the fact that a valid and enduring contract had been entered into.

83.     Defendant WHI and Al Roker Entertainment manufactured an extraordinary circumstance in this situation by acting with a crude retaliatory motive after Plaintiff objected to the destruction of the PBS mandated DEI policy at the production of the Program. Plaintiff acted as a whistle blower in complaining about serious racial issues that existed at the production.

84.     From that time on, without justification, cause, or excuse, Defendants WHI and Al Roker Entertainment targeted, harassed and ultimately terminated Plaintiff, and, in addition, breached, and wrongfully terminated the contract, thereby breaching the covenant of good faith and fair dealing. All of Defendants' actions taken together create an exceptional case, an extraordinary circumstance, and a violation of Plaintiff's rights.

85.     This is a situation where justice requires that the clear and manifest wrong that has taken place be abated, and that an estoppel be invoked against the Defendants.

86.     Plaintiff was harmed because Defendants WHI and Al Roker Entertainment made clear and express promises to Plaintiff in a written agreement with regard to the compensation that Plaintiff would receive in exchange for the services that Plaintiff provided.

87.      Plaintiff relied on the promise made by Defendants and performed services on behalf of Defendant WHI that he would be fully compensated as provided in the January 9, 2023, Agreement.

88.     Because of Defendants' promises and Plaintiff's reasonable reliance thereupon, Plaintiff suffered substantial detriments.

89.     Defendant WHI and its Alter Ego Al Roker Entertainment breached its agreement with Plaintiff and terminated its contract with Plaintiff.

90.     As a result of Defendants' conduct, as is herein alleged, Defendants stand in breach of their obligations to Plaintiff and should be estoped from denying the of a contract and must be estoped from not fully performing each and every obligation owed to Plaintiff.

91.     As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less than $10 million together with reimbursable costs according to proof plus interest, and costs at the maximum legal rate thereon.

## SEVENTH CAUSE OF ACTION
### Quantum Meruit
(Against WHI and its Alter Ego Al Roker Entertainment)

92.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

93.     As alleged above, Plaintiff provided his time and services to Defendants in good faith and pursuant to the terms of the January 2023 Agreement. The time and effort that was provided by Plaintiff on behalf of Defendants is valuable and a material portion of the compensation was founded in the participation in Net Profits in the Agreement that Defendants have now terminated.

94.     Plaintiff provided these services to Defendants with the expectation that that Defendant would be a profit participant under the terms of the Agreement, and Defendant accepted Plaintiff's performance of those service with full knowledge and expectation of Plaintiff's expectation that she would be compensated.

95.     Defendants in terminating the Agreement have terminated Plaintiff's right to be fully compensated Plaintiff for the time and effort that he expended under the January 2023 Agreement and thereby owe Plaintiff for the reasonable value of his services.

96.     The alter-ego allegations stated hereinabove are expressly incorporated herein. As alter egos, WHI, and Al Roker Entertainment are liable for the debts of WHI.

97.     As a result of the acts complained of herein, Plaintiff has been damaged in an amount to be proven at trial, but not less than $10 million.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment
(Against Defendant WHI and its Alter Ego Al Roker Entertainment)

98.     Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

99.     In the event Plaintiff lacks an adequate remedy provided by law, Plaintiff seeks equitable relief to remedy Defendant's unjust enrichment at Plaintiff's expense.

100.    By virtue of the foregoing, Defendants, and each of them, have been unjustly enriched by their unlawful, inequitable, and wrongful conduct alleged herein, including, but not limited to, the Breach of Contract and Promissory Fraud.

101.    As a result of Defendants' wrongdoing, Plaintiff was impoverished, and Defendants were enriched at Plaintiff's expense. Specifically, Plaintiff was impoverished by his provision of services pursuant to the contract between the parties, for which Defendants, absent any justification, wrongfully terminated.

102.    As such, it would be an inequitable and unjust result if Defendants were permitted to retain the benefit of Plaintiff's provision of services without paying the rightful compensation owed to Plaintiff under the contract.

103.    As a result of the acts complained of herein, Plaintiff has been damaged in an amount to be proven at trial, but not less than $10 million.

## NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
(Against All Defendants)

104.    Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

105.    Defendants engaged in extreme and outrageous conduct that was intended to cause Plaintiff to sustain severe emotional distress or which was done in conscious disregard of the harm that the conduct was causing to Plaintiff.

106.    Defendant Al Roker as the head of Al Roker Entertainment and Lisa Tucker in her capacity of Senior Vice President of Al Roker Entertainment were in a position of superiority over Plaintiff. In such capacity, Defendants Roker and Tucker exerted power and control over

Plaintiff. In exercising such power and control, Defendant Roker and Tucker targeted and attempted to psychologically dominate and control Plaintiff in retaliation for his vocal opposition to the dismantling of the PBS-mandated DEI policy.

107.    In terminating the agreement with Plaintiff without any cause or justification after Plaintiff had performed services for WHI and Al Roker Entertainment, Defendants caused Plaintiff to sustain great emotional distress.

108.    Further, the actions of Defendants WHI and its Alter Ego Al Roker Entertainment to deny any obligation to Plaintiff after Plaintiff had performed services on behalf of WHI has caused Plaintiff to sustain great and substantial emotional distress.

109.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and the representations that Defendants made to her, in order to enrich Defendants. Plaintiffs are therefore entitled to recover an award of punitive damages for the sake of example and by way of punishing Defendants, which amount is to be determined according to proof.

110.    As a result of the acts complained of herein, Plaintiff has been damaged in an amount to be proven at trial, but not less than $10 million.

### TENTH CAUSE OF ACTION
**Negligence and Failure to Supervise and Control**
(Against Defendant Al Roker)

111.    Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

112.    Roker controlled WHI and Al Roker Entertainment. At all times alleged herein, Roker was in a position of control and authority over its Senior Vice President Lisa Tucker and Caren Franklin.

113.    As the person and entity in control of WHI and in control of Tucker and Franklin had a duty and obligation to supervise and control the actions of the Tucker and Franklin in his capacity as CEO of Al Roker Entertainment and otherwise.

114.    Defendant Roker breached his duty of care and failed to adequately supervise the activities of Tucker and Franklin.

115.     Under the doctrine of respondeat superior, Roker is responsible for the illegal conduct of Tucker and Franklin as alleged hereunder.

116.     As the proximate result of the of the conduct by Roker, Plaintiff sustained damages in an amount to be proven at trial, but not less than $10 million.

.

### ELEVENTH CAUSE OF ACTION
**Tortious Interferences with Contract**
(Against Al Roker Entertainment)

117.    Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein. As an alternative theory of Recovery in the event that Al Roker Entertainment is found not to have Alter Ego liability:

118.     Plaintiff entered into a valid and subsisting contract with WHI.

119.    Al Roker Entertainment interfered with the Contract between Plaintiff and WHI and failed and refused to allow the performance of the Contract between Plaintiff and WHI and Plaintiff and did not allow performance of the contract by WHI.

120.     Plaintiff is informed and believes, and on that basis alleges, that Al Roker Entertainment caused Lisa Tucker to take actions to terminate the Agreement between Plaintiff and WHI.

121.     Plaintiff is informed and believes, and on that basis alleges, that the misconduct by Al Roker Entertainment, as alleged herein, was intended by Al Roker Entertainment to cheat, was despicable conduct by Al Roker Entertainment with a willful and conscious disregard of the rights and interests of Plaintiff, and/or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights and interests such as to constitute malice, oppression, or fraud, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendant Al Roker Entertainment.

122.    Defendant Al Roker Entertainment, acted with oppression, intent and malice and as such Plaintiff is entitled to an award of punitive or exemplary damages to punish Defendants and each of them for their wrongful conduct. As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less $10 million together with reimbursable costs according to proof plus interest, and costs at the maximum legal rate thereon.

## TWELFTH CAUSE OF ACTION
**Violation of New York State Whistleblower Statute (New York Labor Code Section 740)**
(Against All Defendants)

123.    Plaintiff re-alleges and incorporates by reference the allegations contained in each and every preceding paragraph above as though fully set forth herein.

124.    New York Labor Code Section 740(2) provides that "[a]n employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:

(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;

(b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such activity, policy or practice by such employer; or

(c) objects to, or refuses to participate in any such activity, policy or practice.

125.    Pursuant to New York Labor Code Section 740(1)(a), "employee" includes independent contractors such as Plaintiff.

126.    Here, as alleged extensively above, Plaintiff disclosed to his Defendant supervisors Defendants' unlawful and discriminatory attempts to evade PBS's mandatory DEI policy and refused to assist Defendants in implementing these unlawful actions. And, as a result,

Plaintiff was unlawfully terminated by Defendants.

127.    Pursuant to New York Labor Code Section 740(5)(a-g) Plaintiff thus seeks an injunction to restrain continued violation of Section 740; the reinstatement to the same position held before the retaliatory action, or to an equivalent position, or front pay in lieu thereof; the reinstatement of full fringe benefits and seniority rights; the compensation for lost wages, benefits and other remuneration; the payment by the employer of reasonable costs, disbursements, and attorney's fees; a civil penalty of an amount not to exceed ten thousand dollars; and the payment by the employer of punitive damages.

128.    Defendants acted with oppression, intent, wantonness and malice and as such Plaintiff is entitled to an award of punitive or exemplary damages to punish Defendants and each of them for their wrongful conduct. As a direct and proximate result of the Defendants' conduct, Plaintiff has been directly damaged in an amount to be proven at trial, but not less $10 million together with reimbursable costs according to proof plus interest, and costs at the maximum legal rate thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

A.    For judgment against the Defendants, and each of them, and in favor of the Plaintiff for the amount of damages sustained by the Plaintiff as a result of each of the Defendants' wrongful conduct as alleged herein in an amount to be determined at time of trial, but in any event not less than $10 million;

B.    For actual and compensatory damages in an amount to be proven at trial, but not less than $10 million;

C.    For general damages in an amount according to proof at trial but in no event less than $10 million;

D.      For special damages in an amount according to proof at trial;

E.      For exemplary and punitive damages in an amount to be determined at the time of trial;

F.      For attorney's fees and costs as permitted by applicable law;

G.      For pre-judgment and post-judgment interest at the maximum legal rate; and,

H.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues properly triable by jury.


DATED: April 15, 2024                    Respectfully Submitted,

                                         **FROST LLP**



                                         _____
                                         CHRISTOPHER L. FROST*
                                         JOHN D. MAATTA*
                                         OHIA AMADI *
                                         ZACH WEST*
                                         JEFFREY BOGERT*
                                         PETER POTTIER

                                         FROST, LLP

                                         10 Confucius Plaza #15K
                                         New York, NY 10002

                                         10960 WIlshire Blvd.
                                         Ste. 1260
                                         Los Angeles, CA 90024

                                         john@frostllp.com
                                         ohia@frostllp.com
                                         zach@frostllp.com
                                         jeff@frostllp.com
                                         peter@frostllp.com

                                         *Attorneys for Plaintiff William "Bill" Schultz
                                         *Petition for Pro Hac Vice admission in
                                         process*